J-S38011-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| EDWIN ISLAS-CRUZ | : | |
| | : | |
| Appellant | : | No. 3100 EDA 2022 |

Appeal from the Judgment of Sentence Entered November 17, 2022
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0000399-2022

BEFORE:   LAZARUS, J., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED OCTOBER 30, 2023**

Edwin Islas-Cruz appeals from the judgment of sentence, imposed in the Court of Common Pleas of Montgomery County, after a jury convicted him of first-degree murder on a theory of transferred intent.[1]  After our review, we affirm.

The trial court set forth the factual history of this matter as follows:

On November 14, 2022, the four-day jury trial commenced and established the following facts.  Corporal Tyler North of the Norristown Police Department was on duty on September 18, 2021, and[,] just prior to 5:30 p.m., he heard several shots fired. He responded to the scene and observed a male, later identified a[s] Barry Fields, with an apparent gunshot wound to his head

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The trial court, sitting without a jury, also convicted Islas-Cruz of persons not to possess a firearm based upon the trial testimony and certified copies of Islas-Cruz's relevant prior convictions.

outside of 641 Astor Street. The officer shut down the block for the ensuing investigation[] and spoke with several witnesses.

Jodi Peregrina, a resident of 641 Astor Street[] and the victim's sister, testified that on the day of the murder[,] she was sitting in front of her residence around 5:00 p.m. with her family. Prior to the shooting, two unknown males walked past her[;] one was later identified as [Josh] Agudio.

About twenty minutes later[,] a dark[-]colored vehicle pulled up and double[-]parked[;] two males[2] jumped out [of] the vehicle[]and started shooting. Ms. Peregrina and her family took cover, but her brother was shot.

Lieutenant William Mitchell of the Montgomery County Detective Bureau gathered surveillance video from 641 Astor Street. The video captured a black Toyota Camry pull up around 5:20 p.m. and two individuals exit the vehicle. Sixteen seconds later shooting starts. Within eight seconds from the initial shooting, the victim was shot. Ballistics evidence determined that there were three different firearms that fired the casings found at the scene.

The lieutenant learned that the vehicle was registered to Christopher Ladson-Singleton[, who was living with Islas-Cruz's sister at the time of the murder.] Mr. Ladson-Singleton testified that he had owned a 2019 black Toyota Camry, and that he had given [Islas-Cruz] permission to borrow it on September 18, 2021.

In the course of the investigation, Lieutenant Mitchell reviewed several prison calls from Agudio while incarcerated on [an] illegal straw[-]purchase gun case. They revealed that Agudio received discovery for the case and he found out that the other individuals involved gave statements and told on each other.

Lieutenant Mitchell also obtained the contents of numer[o]us Instagram accounts. He testified, *inter alia*, that[,] beginning on August 14, 2021, he began to see postings in which Agudio was calling individuals ["]rats.["] A story was posted to Agudio's Instagram account that stated, "Y'all niggas rats. Paperwork be

_____

[2] The Commonwealth contends that the two men who exited the black Camry were Islas-Cruz and his brother, Giovanni. As of the time of trial, Giovanni's whereabouts were unknown and there was a warrant for his arrest for murder. *See* N.T. Trial, 11/16/22, at 102.

up soon. Zon [Edzon Castrejon], Snacks [Mark Castrejon], and Reese." On August 18, 2021, [Islas-Cruz's] Instagram account posted a video story in which [Islas-Cruz] was rapping about "catching a body" and holding a firearm consistent with the Ruger used during the homicide. On August 20, 2021, Agudio's account posted a Montgomery County Detective Bureau supplemental report regarding his illegal straw purchase gun case, and the post read, "Y'all told tonight"'—with emojis, including of a gray rat. An additional post contained [] the supplemental report, tagging Mr. Castrejon, Tyrese Dilworth-Simon, and Edzon Castrejon. On August 21, 2021, [Islas-Cruz's] account posted an Instagram video. Also on August 21, 2021, Agudio's account sent a direct message to Edzon's account. He posted a photo of more discovery related to the straw[-]purchase case. [Islas-Cruz's] Inst[a]gram account story stated, "If it's rumors you a rat I'm not fucking with you I don't give a fuck if it's true or not show your work and push something." On August 28, 2021, a video is post[ed] to [Islas-Cruz's] account of him rapping about "that's why I keep a 30 with a laser so I can spray you." Next, the lieutenant testified about [] messages from [the account belonging to] Agudio[], who was out of jail now and presumably in control of his Instagram account, to an account named Taz_odrama. The Lieutenant testified that these messages indicated that Agudio was looking for a gun.

On September 2, 2021, there was a conversation between [Islas-Cruz's] and Agudio's account[s] in which Agudio accuses Edzon Castrejon and Mark Castrejon of giving [] statement[s] to police implicating him in the illegal straw[-]purchase gun case. [Islas-Cruz's] account communicates with another Instagram account attempting to find [out] who Agudio is, and relating that Agudio was accusing Edzon Castrejon and Mark Castre[j]on of implicating [Agudio] in the illegal straw[-]purchase gun case. On September 14, 2021, there were several video[s] posted on [Islas-Cruz's] account depicting a barrel of a gun [with a] laser [attached to it]. On September 16, 2021, [Islas-Cruz's] account posted, "One false move nigga you a goner been masking up way before Corona."

On the day before the murder, on September 17, 2021, Agudio is waving a gun around on Instagram live. He was rapping about "getting back in blood." On the same date, [Islas-Cruz's] account posted, "Bro know I'm going to shoot until my hand so hot so I got to stay strapped niggas trynna kill me and the DA trynna find a way to wheel me I was getting high hoping if I get booked just write me I'm going to be in hell most likely."

- 3 -

. . .

Agudio was arrested on September 29, 2021. Detective Anthony Caso of the Montgomery County Detective Bureau interviewed him. Agudio told the detective two conflicting versions of events. First, he stated that he was shot at. He also told the detective that, "they upped their guns" and he started shooting.

[On October 4, 2021,] Officer Jordan Girardi of the Nebraska State Patrol was on patrol [when,] in the course of his duties[,] he made a traffic stop for a speeding car. During the vehicle stop, he smelled marijuana coming from the vehicle. In the front passenger seat was an individual, identified as Pedro Gonzalez[, who was] later determined to be [Islas-Cruz]. Pursuant to a vehicle search, Officer Girardo located a Ruger 9mm handgun under the front passenger seat where [Islas-Cruz] was seated. Underneath the seat in front of the rear passenger area was a 9mm ghost handgun without a serial number. Giovanni Cruz had been seated in the rear passenger seat. All occupants of the vehicle were arrested. Officer Girardi later learned that there was a warrant for [Islas-Cruz's] arrest for first-degree murder. [Islas-Cruz] was taken into custody by Detective Caso on October 10, 2021.

Detective David Schanes of the Montgomery County Detective Bureau went to the murder scene on September 18, 2021, collected the ballistic evidence, and submitted the evidence for analysis. There were 39 fired cartridge casings ("FCC") at the scene, four projectiles, and two fragments of projectiles. There was also a projectile recovered at the autopsy. The FCC were attributed to three separate firearms. Referring to a diagram, the detective identified three groupings of the ballistics evidence. There was a yellow grouping of 14 FCC, a pink grouping of 13 FCC, and blue grouping of 12 FCC.

Detective Eric Nelson, an expert in firearm identification, explained that his analysis of the FCC, he determined that three different firearms fired the 39 FCC. One of the firearms recovered in Nebraska fired 14 FCC. A second Nebraska firearm fired 12 FCC. The remaining 13 FCC at the murder scene came from an unidentified firearm. The two Nebraska firearms included[] a Ruger 9mm, model 9E semiautomatic, equipped with a flashlight laser combination sighting device and an extended magazine assembly. The second Nebraska firearm matched to the murder scene was a Polymer80 ghost gun, 9mm caliber pistol. It was

submitted with an extended magazine. The expert determined that it was the Polymer80 that fired the 14 FCC at the murder scene and that the Ruger fired the 12 FCC found at the scene.

Detective Nelson also analyzed [] eight 9mm FCC found at [a separate shooting that occurred in Norristown two days before the murder.] He concluded that the Ruger pistol from the September 18, 2021 shootout[ also] fired the eight FCC [at the earlier shooting].

Trial Court Opinion, 2/17/23, at 2-8 (citations to record and footnotes omitted).

After the jury returned a guilty verdict, Islas-Cruz was immediately sentenced to a mandatory term of life imprisonment. Islas-Cruz filed a timely notice of appeal, followed by a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. He raises the following claims for our review:

1. Should [] Islas-Cruz have been granted a jury charge on imperfect self-defense?

2. Were issues properly preserved by [Islas-Cruz] at trial?

3. Should the evidence and testimony [regarding] the earlier shooting [on] September 16, 2021 [have] been excluded from trial under [Pennsylvania] Rule of Evidence 403?

4. Should evidence of violent rap lyrics from Instagram posts have been excluded from trial under [Rule] 403?

Brief of Appellant, at 2-3 (reordered for ease of disposition; unnecessary capitalization omitted).

Islas-Cruz first argues that the trial court abused its discretion in refusing to instruct the jury on imperfect self-defense. "[O]ur standard of review when considering the denial of jury instructions is one of deference—

an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law." ***Commonwealth v. Janda***, 14 A.3d 147, 163 (Pa. Super. 2011).

Islas-Cruz asserts that Agudio fired first, from a handgun he had concealed behind his body, and that Islas-Cruz did not fire until he had been fired upon. ***See*** Brief of Appellant, at 9. He argues that he had "every opportunity to [fire first], having approached [] Agudio with displayed weapons, but did not, even though at the time[,] Agudio was a point-blank target who was literally sitting on a step." ***Id.*** Moreover, Islas-Cruz was "trying to get back into [his] car, under heavy fire from Agudio (who fired 13 shots in 8 seconds, per the police firearms expert), when Agudio's fatal bullet struck the victim." ***Id.*** Islas-Cruz argues that he "may have intended to intimidate, he may have intended to provoke fear in [] Agudio, but there is a valid and clear argument . . . that he did not intend to cause death or serious bodily injury." ***Id.*** at 11.

Islas-Cruz further argues that, contrary to the trial court's finding that Islas-Cruz "could not be found to be free of fault or provocation" because he exited the car brandishing a firearm, ***see*** Trial Court Opinion, 2/17/23, at 10, "mere display of a firearm, as [] Islas-Cruz [] did, has not precluded even claims of actual self-defense." Brief of Appellant, at 10.

Under 18 Pa.C.S.A. § 2503(b):

> A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would

justify the killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable.

18 Pa.C.S.A. § 2503(b). In explaining the elements necessary to establish unreasonable belief voluntary manslaughter—sometimes referred to as "imperfect self-defense"—our Supreme Court has stated:

> This self-defense claim is imperfect in only one respect—an unreasonable rather than a reasonable belief that deadly force was required to save the actor's life. All other principles of justification under 18 Pa.C.S.[A.] § 505 must [still be met in order to establish] unreasonable belief voluntary manslaughter.

*Commonwealth v. Tilley*, 595 A.2d 575, 582 (Pa. 1991).

In order to establish the defense of self-defense under section 505, the defendant must not only show that he was protecting himself against the use of unlawful force **but must also show that he was free from fault in provoking or continuing the difficulty which resulted in the killing**. *See* 18 Pa.C.S.A. § 505. Additionally, "the defense of self-defense necessarily requires that the appellant admit that the shooting was intentional in order to protect [oneself]." *Commonwealth v. Harris*, 665 A.2d 1172, 1175 (Pa. 1995), citing *Commonwealth v. Hobson*, 398 A.2d 1364, 1368 (Pa. 1979). Islas-Cruz is entitled to no relief.

First, Islas-Cruz did not concede that he was at the scene of the crime, much less that he intentionally shot at Agudio in self-defense, as the law requires. *See Harris*, *supra*. Rather, the defense theory of the case involved denying that Islas-Cruz was one of the two people that jumped out of the

dark-colored vehicle and began shooting. During his opening statement, defense counsel argued as follows:

> Pay close attention to the evidence because, again, I don't believe that the Commonwealth is going to be able to definitively, beyond a reasonable doubt, place my client in that vehicle at that particular time on September 18th of 2021. So[,] keep that in mind because that's what they have to prove beyond a reasonable doubt, number one, that my client was involved, and I suggest to you that there's going to be plenty of reasons to pause or hesitate to suggest that my client was not in that vehicle at the time of this incident.

N.T. Trial, 11/14/22, at 34. Having failed to admit that he intentionally shot at Agudio, let alone that he was even at the scene of the crime, the defense of imperfect self-defense is inapplicable, and the trial court did not err in declining to instruct the jury on that defense.

Moreover, the evidence adduced at trial demonstrates that, upon pulling up to the scene of the crime, Islas-Cruz leapt out of a car brandishing a weapon. Thus, even if Agudio actually fired the first shots, Islas-Cruz was not "free from fault in provoking . . . the difficulty which resulted in the killing." 18 Pa.C.S.A. § 505. A review of *Commonwealth v. Samuel*, 590 A.2d 1245 (Pa. 1991), on which Islas-Cruz relies to support his provocation argument, does not alter our conclusion. There, the defendant's sister, Yaffa, had asked her husband, Richard, to move out of their apartment due to Richard's drug and alcohol problems. Yaffa asked defendant to move into the apartment "for the dual purpose of assisting her financially and discouraging, by his presence, Richard's return." *Id.* at 1246. That evening, defendant arrived at the apartment with his clothes and a handgun, which he carried home in a pouch

- 8 -

each evening from his place of business. *See id.* Shortly thereafter, Richard arrived at the apartment, visibly intoxicated. *See id.* With defendant standing beside Yaffa with his handgun visible, Yaffa asked Richard to leave or she would call the police. *See id.* at 1246-47. Richard refused and Yaffa called the police. *See id.* at 1247. While she was doing so, Richard left the room and walked towards the bedrooms, cursing at defendant. *See id.* Defendant then went into the kitchen/dining area and sat down, placing his gun back in its pouch on the table. *See id.* Yaffa completed her call to the police and went to see what Richard was doing. *See id.* Richard then came towards her carrying a sawed-off shotgun. *See id.* As Yaffa screamed, "he's got the gun, he's got the gun," Richard pumped the cocking device, loading a shell into the chamber. *Id.* Defendant quickly entered the living room, with his gun at his side. *See id.* Richard pointed his shotgun at defendant and defendant fired three shots, two of which struck Richard in the chest, killing him. *See id.* Defendant was charged with murder and possessing an instrument of crime ("PIC"). He pled not guilty, alleging self-defense and defense of others. *See* 18 Pa.C.S.A. §§ 505, 506. The trial court, sitting without a jury, convicted defendant of voluntary manslaughter and PIC, finding that defendant's belief that he fired in self-defense was unreasonable, as he had provoked the fatal encounter by previously displaying his handgun to Richard. Thus, the trial court reasoned, defendant failed to establish that he was free from fault, precluding his reliance on the doctrine of self-defense.

On appeal, this Court affirmed, and the Supreme Court granted allowance of appeal.

The Supreme Court reversed, stating that "[i]n order to establish that an actor was the aggressor or provoker and, hence, was not entitled to claim a defense of self-defense or defense of others, there must be some evidence to support the inference that the defendant's acts constituted 'an intent to cause death or serious bodily injury.'" *Id.* at 1248. The Court concluded that the facts of the case did not meet that requirement, as, prior to Richard leaving the room and returning with a shotgun, there was "no suggestion that [defendant] pointed the gun at[,] . . . physically assaulted[,] . . . threatened[,] . . . or [] had any physical contact with [Richard]." *Id.* Rather, the defendant only raised his gun and fired at Richard after Richard aimed his own gun at the defendant. Moreover, "[e]ven if the initial display of [defendant's] gun could be seen as provocative, the balance between the parties shifted when Richard left the room and defendant retreated to the dining area, setting down his weapon. Richard's re-entry into the living room with a sawed-off shotgun placed him in the position of being the aggressor." *Id.* at 1249.

Islas-Cruz attempts to extrapolate from the Supreme Court's holding in **Samuel** that the mere display of a handgun cannot be deemed to be provocation for purposes of section 505. As a result, he would have us conclude that Islas-Cruz's act of exiting the car brandishing a gun was not provocation as contemplated by the statute. He is wrong, and his reliance on **Samuel** is misplaced. In **Samuel**, the Court held that the defendant merely

holding his gun at his side did not constitute provocation because: (1) there was no other evidence of the defendant's intent to cause death or serious bodily injury, where he had held the gun at his side in a nonthreatening manner; and (2) following an initial encounter, the defendant put down his gun, Richard left the room but then re-entered with a sawed-off shotgun, placing Richard in the position of aggressor. *See Samuel*, 590 A.2d at 1248–49. In contrast, here, Islas-Cruz and his brother jumped out of their vehicle with their guns drawn, after previously engaging with Agudio in an online dispute, and approached Agudio, who was in a seated position on a step with his weapon concealed. "[A] valid claim of self-defense cannot be made out by the killer when the killer introduces a weapon into the encounter without provocation. Such introduction operates to deny the killer's assertion that he was free from fault in provoking the difficulty." *Commonwealth v. Johnson*, 331 A.2d 473, 476 (Pa. 1975). Here, Islas-Cruz "introduced a weapon into the encounter without provocation." *Id.* Accordingly, because he was not free from fault in provoking the shooting, the trial court did not err in denying Islas-Cruz's request for an imperfect self-defense instruction.[3]

Islas-Cruz's final two claims involve evidentiary rulings made at trial by the court. Prior to addressing those claims, however, we must determine whether he has properly preserved them. On May 11, 2022, the

---

[3] Given the provocative acts by the Islas-Cruz brothers, it is of no moment that Agudio may have been the first to actually fire his gun. Indeed, the trial court granted Agudio's request for a self-defense instruction. *See* N.T. Trial, 11/17/22, at 8-11.

Commonwealth filed a motion *in limine* to admit certain bad acts evidence under Pa.R.E. 404(b). This evidence included evidence of the Norristown shooting that occurred two days before the instant shooting and social media videos of Islas-Cruz rapping. The trial court never ruled on the Commonwealth's motion. Subsequently, at trial, the Commonwealth introduced evidence of both the prior shooting and the social media videos. At no time did defense counsel object to the admission of that evidence.

> In 2001, Pa.R.E. 103(a) was amended to add the following paragraph: "Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal." *Id.* The amendment to Pa.R.E. 103(a) is identical to the amendment to F.R.E. 103(a)[, which] became effective on December 1, 2000. [*See*] Pa.R.E. 103(a), Comment.
>
> Consistent with the above amendment to Pa.R.E. 103(a), a motion *in limine* may preserve an objection for appeal without any need to renew the objection at trial, **but only if the trial court clearly and definitively rules on the motion**. [*See*] Pa.R.E. 103, Comment ("A ruling on a motion *in limine* on record is sufficient to preserve the issue for appeal, without renewal of the objection or offer at trial."); *Trach v. Fellin*, 817 A.2d 1102, 1107 n.3 (Pa. Super. 2003) (en banc ). Conversely, if the trial court defers ruling on a motion *in limine* until trial, the party that brought the motion must renew the objection at trial or the issue will be deemed waived on appeal. [*See*] F.R.E. 103, Advisory Committee Notes—2000 Amendments ("[W]hen the trial court appears to have reserved its ruling or to have indicated that the ruling is provisional, it makes sense to require the party to bring the issue to the court's attention subsequently."); [*id.*] (citing *United States v. Valenti*, 60 F.3d 941, 945 (2d Cir. 1995)) ("Valenti's briefs and appendix contain no indication that he renewed at trial his request for a ruling, a step clearly required when the trial judge had earlier stated that he would reserve judgment until he heard the trial evidence. The failure to renew the objection constituted a waiver of the objection."); *see Markham v. Nat'l States Ins.*

*Co.*, 122 Fed.Appx. 392, 397 (10th Cir. 2004); *Douthit v. Jones*, 619 F.2d 527, 538–39 (5th Cir. 1980).

*Blumer v. Ford Motor Co.*, 20 A.3d 1222, 1232 (Pa. Super. 2011) (finding hearsay objection waived where appellants did not lodge hearsay objection to evidence during trial, nor ask trial court to issue definitive ruling on motion *in limine*).

Because Islas-Cruz did not object at trial to the admission of the evidence of which he now complains, he has waived his claims on appeal.[4]

Judgment of sentence affirmed.

_____

[4] As the trial court properly notes, Islas-Cruz has waived his objection to the admission of the rap videos for two additional reasons:

> First, counsel's opposition to the videos [as stated in his written response to the Commonwealth's motion *in limine*] were to all of the videos, [both] the ones [in which Islas-Cruz is] rapping and the ones [in which] he is not. However, [Islas-Cruz's] issue on appeal makes a new argument by singling out the rap videos, arguing that they should not have been admitted because they "did not contain threats against any particular person" and only "portray [Islas-Cruz] as an individual who made regular threats of murder through his music[,]" which was highly prejudicial. *See* [Rule 1925(b) Statement, 12/28/22, at ¶ 3]. This argument was never asserted until this appeal. [S]econdly, this issue is waived because counsel agreed in his brief that "[t]his [c]ourt should permit the Commonwealth to introduce only one (1) of the aforesaid social media posts." *See* Brief in Opposition to Motion *in Limine*, [] 5/27/22[, at 9]). Implicit in this concession is counsel's concurrence that [] this evidence was [admissible for] a legitimate reason under the law[.] Therefore, the appellate issue raised herein, namely that the social media rap videos should not have been admitted *in toto*, has not been preserved, and is waived on appeal. [*See*] Pa.R.A.P. 302(a).

Trial Court Opinion, 2/17/23, at 20.

- 13 -

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/30/2023